IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.
BRAD L. DEMUZIO

Plaintiff,

v.

UNITED STATES OF AMERICA
Defendant.

---

COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIM ACT AND JURY DEMAND

---

Plaintiff, Brad L. Demuzio, (Demuzio), by counsel, for his Complaint against the Defendants, United States of America.

**INTRODUCTION**

1. This is an action against the Defendant United States of America under the Federal Tort Claim Act, (28 U.S.C. §2671, *et. seq*. ) and 28 U.S.C. §1346(b)(1), for negligence and professional malpractice in connection with medical care provided to Plaintiff Demuzio by the Defendant.
2. The claims herein are brought against the Defendant pursuant to the Federal Tort Claim Act, (28 U.S.C. §2671, *et seq*.) and 28 U.S.C. §1346(b)(1), for money damages as compensation for personal injuries caused by the Defendant's negligence.
3. Plaintiff Demuzio has fully complied with the provision of 28 U.S.C. §2675 of the Federal Tort Claims Act. *Standard Form 95 attached as Exhibit 1, excluding medical records as exhibits.*
4. This suit has been timely filed, in that Plaintiff Demuzio timely served notice of his claim on both the Federal Bureau of Prisons, and the United States Department of Justice less

than two years after the incident forming the basis of this suit.

5. Plaintiff Demuzio is now filing this Complaint pursuant to 28 U.S.C. §2401(b) after receiving the U.S. Department of Justice Federal Bureau of Prisons May 02, 2017 notice of "Final Denial of Claim." *Administrative Claim Number* ***TRT-NCR-2017-01395*** *attached as Exhibit 2.*

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 in that this action arises under the laws of the United States of America and is premised on the acts and omissions of the Defendant acting under the color of federal law. This Court further has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1346(b)(1) in that this is a claim against the Defendant, the United States of America, for money damages, accruing on or after January 1, 1945, for the government while acting within the course and scope of their office or employment, under the circumstances where the Defendant, if a private person, would be liable to the plaintiff.

7. Jurisdiction founded upon the federal law is proper in that this action is premised upon federal causes of action under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §2671, *et. seq.*

8. Pursuant to the FTCA, 28 U.S.C. §2671, *et. seq.*, the Plaintiff Demuzio sent his claim to the appropriate federal agency. Plaintiff Demuzio presented his claim to the appropriate federal agency for administrative settlement under the FTCA requesting $1,800,00.00 (One million Eight Hundred Thousand Dollars). The agency informed Plaintiff Demuzio, via letter, that Plaintiff Demuzio's claim was received November 14, 2016. *(Attached as Exhibit 3).* By letter dated May 02, 2016, Plaintiff Demuzio's claim was finally decided in writing by the Federal Bureau of Prisons and such denial was sent by certified or

registered mail to the Plaintiff. (*See Exhibit 2*). This lawsuit was then timely filed.

9. This action is timely pursuant to 28 U.S.C. §2401(b) in that it was presented to the appropriate federal agency within two years of accrual and this action was filed within six months of receipt of the certified letter sent by the federal agency denying the claim.

10. Venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and 1391(c), as Defendant does business in this judicial district and the events or omissions giving rise to the claim occurred in this judicial district.

**PARTIES**

11. Plaintiff Demuzio, currently resides in the state of Idaho.

12. Plaintiff Demuzio is 38 years old and was an inmate at the Federal Bureau of Prisons (BOP), an agency of Defendant at Federal Prison Camp in Florence, Colorado from 12/18/12 to 10/28/15.

13. Defendant, United States of America, is subject to suit for personal injury caused by the negligent and wrongful acts and omissions of employees of the Government while acting within the course and scope of their office or employment, under the circumstances where the Defendant, if a private person, would be liable to the Plaintiff, pursuant to the FTCA.

14. At all times material to this action, Defendant was responsible for the correct and prompt response to the health care needs of inmates in its custody.

15. At all times material to this action, Plaintiff Demuzio was an inmate subject to the custody and control of the Defendant and subject to the care and treatment of the Defendant for any and all medical evaluations and treatment.

16. At all times material to this action, if Plaintiff Demuzio required medical evaluation and/or treatment, his only avenue was to rely on the medical evaluation and treatment

provided by the Defendant.

**FACTUAL ALLEGATIONS AND STATEMENT OF CLAIM**

17. At 3:00 a.m. on December 31, 2014, Plaintiff Demuzio awoke experiencing severe pain in his groin area. The pain caused Plaintiff Demuzio to sweat profusely, requiring him to change his clothes and bedding. The pain was in the Plaintiff Demuzio's right testicular area, lower right abdomen and the right side of his lower back. He was unable to stand up erect and experienced severe pain when he attempted to walk.

18. At 6:00 a.m. the Federal Prison Camp (FPC) compound opened and Plaintiff Demuzio reported to sick call at the Health Services Unit (HSU) where he worked as the Camp medical orderly. Plaintiff Demuzio reported for work as required but also to be seen as a patient. At approximately 7:30 a.m. Dr. George Santini arrived at the HSU and examined Plaintiff Demuzio. He was asked to provide a urine sample to determine if he had a kidney stone, which was ruled out. Dr. Santini postulated that Plaintiff Demuzio was suffering from a urinary tract infection and prescribed Bactrim, an antibiotic, which Plaintiff Demuzio was able to obtain from the Camp pharmacy the evening of December 31, 2014. Dr. Santini told Plaintiff Demuzio that he would have an X-ray done on Friday, January 2, 2015, as the HSU was closed on New Year's Day.

19. At 8:00 p.m. Plaintiff Demuzio's right testicle was swollen to the size of a grapefruit. The pain was nearly unbearable and he could not get out of bed without assistance. Due to the New Year's Day holiday, no medical staff was available at the FPC and he was unable to get any medical assistance. Plaintiff Demuzio was unable to walk or sleep due to the extreme pain.

20. On Friday, January 2, 2015, Plaintiff Demuzio reported to the HSU at the 6:00 a.m. sick call. The swelling and pain in his groin had not subsided in the least. Plaintiff Demuzio

was examined by a U.S. Public health Service (USPHS) nurse on loan to the FPC from the USP facility. Based upon her examination she informed Plaintiff Demuzio that this testicle was torsioned and that he was in need of emergency medical treatment at a hospital. Plaintiff Demuzio was told he needed to be transported to the hospital for immediate treatment in order to save his testicle.

21. The USPHS nurse called Dr. Oba, the BOP staff physician serving the entire Prison Complex. She asked for authorization to send Plaintiff Demuzio to the hospital immediately in order to treat the medical emergency she had identified. Plaintiff Demuzio's symptoms and the area of pain should have been addressed within hours of the onset of pain. Despite the fact that Dr. Oba had never examined Plaintiff Demuzio, and, apparently ignoring the USPHS nurse's decision, Dr. Oba denied authorization for Plaintiff Demuzio to go to the hospital for emergency treatment. Dr. Oba then issued a prescription for Cipro flaxen and to the USPHS nurse that Plaintiff Demuzio's medical situation was not an emergency.

22. The USPHS nurse apologized for Dr. Oba's decision to deny emergency medical treatment. She gave Plaintiff Demuzio an injection of Tordal to relieve the intense and constant pain. Plaintiff Demuzio then returned to his assigned cubicle. Plaintiff Demuzio was able to sleep until the pain medication wore off around noon on January 2, 2015. He was unable to return to HSU for further examination or to receive any further medication for the constant pain until Tuesday, January 6, 2015, because there were no providers available as the FPC medical staff was on extended leave for the New Year's holiday.

23. On Tuesday, January 6th, 2015 Plaintiff Demuzio was examine by a USPHS nurse practitioner. He was then immediately transported to the emergency room at St. Thomas Moore Hospital in Canon City, Colorado. The emergency room staff completed a CAT

scan and ultrasound examination of the affected area. The radiologist informed Plaintiff Demuzio that the blood flow to the testicle had been interrupted and the testicle would need to be surgically removed. Plaintiff Demuzio was then examined by a Urologist, Dr. Harrigan, who confirmed the diagnosis of the radiologist. Plaintiff Demuzio was transported back to the FPC where he received no further examinations or prescription medication to manage the constant pain and continued swelling.

24. From January 7 to January 13, 2015 Plaintiff Demuzio was in daily contact with the HSU medical staff, including Dr. Santini and Nurse practitioner Cordova and Physician's Assistant Camacho who each examined him and confirmed the medical diagnosis of the urologist Dr. Harrigan. Plaintiff Demuzio inquired daily as to when he would receive approval from the BOP medical authorities to be transported or for the prescribed treatment of his medical condition. He always received the same reply, "soon."

25. On January 13, 2015 Plaintiff Demuzio was transported to St. Thomas Moore pursuant to Dr. Harrigan's instructions and had another ultrasound conducted on the affected area. After examination the same staff radiologist confirmed his initial diagnosis that the testicle would need to be removed.

26. On January 15, 2015 Plaintiff Demuzio was transported to Dr. Harrigan's office. Dr. Harrigan told Plaintiff Demuzio it was his medical opinion that the testicle would need to be removed as soon as possible. Despite Dr. Harrigan's opinion, Plaintiff Demuzio was not taken to the hospital but was transported back to the FPC. Plaintiff Demuzio received no further treatment or prescription medication from the HSU medical staff.

27. From January 16 to February 2, 2015, Plaintiff Demuzio continued to inquire daily of the HSU medial staff as to the status of the BOP approval for the surgery ordered by Dr. Harrigan. He was never given a definitive answer or provided a date for the surgery. The

    HSU medical staff provided neither treatment nor any prescription medication to alleviate the constant pain. Several times during the two week period he showed the affected area to the HSU medical staff members in an effort to expedite a decision for the recommended surgery to remove the dead testicle. Not one member of the HSU medical staff who examined Plaintiff Demuzio disagreed with Dr. Harrigan's medical diagnosis and proposed treatment.

28. From December 31, 2014 until February 3, 2015, a period of 34 days Plaintiff Demuzio was in constant pain and distress to the point where he was not able to function in the normal activities of daily life. He was not provided any medication except one injection of Tordal. Further Plaintiff Demuzio was not provided any medical advice or assistance regarding eating or eliminating waste. He was not relieved from his assigned work duties in the HSU and he was required to remain in his assigned housing range with 36 other inmates using the same two toilets and shower facilities. Sleeping, resting, and recuperating under those conditions were difficult if not impossible.

29. Defendant has in its employ and/or agency doctors, nurses, and other medical care providers, over which it exercises control and supervision. At all times material to this action, Defendant authorized these agents and employees to act for Defendant when they committed the negligent act alleged herein. Defendant's agents and employees accepted the undertaking of acting on behalf of Defendant when they committed the negligent acts herein. Defendant had control over it agents and employees when they committed the negligent acts alleged herein.

30. The negligent acts and/or omissions of Defendant's agents and employees were committed while acting within the course and scope of their employ and/or agency with Defendant. Thus, Defendant is vicariously liable for the actions of it agents and

employees when they committed the negligent acts alleged herein.

31. At all times material to this action, Defendant had a non-delegable duty to provide Plaintiff Demuzio with reasonable medical care.

32. Defendant's deliberate indifference and omission to treat Plaintiff Demuzio's serious medical needs clearly caused the loss of Plaintiff Demuzio's right testicle and unnecessarily prolonged Plaintiff Demuzio's pain and suffering in violation of the Eighth Amendment. The Supreme Court's decision in Estelle v. Gamble, 429 U.S. 97, 97 S.CT. 785 (1976), and the Tenth Circuit's decision in Oxendine v. Kaplan, 241 f.3d 1272, (10th Cir. 2001).

33. Defendant's deliberate indifference and negligent noncompliance with the instructions and orders of Dr. Harrigan, a urology specialist, objectively demonstrates Defendant's liability for Plaintiff Demuzio's damages.

34. Defendant prevented and delayed Plaintiff Demuzio in obtaining specialized treatment for medical need that was so obvious that even a lay person or any reasonable person would easily recognize the necessity for a doctor's attention and treatment.

35. At all times to this action, Defendant by and through its staff, physicians, employees, and/or agents acting within the course and scope of their employment and/or agency, undertook a duty to render medical care to Plaintiff Demuzio, in a skillful and careful manner, in accordance with the accepted standards of medical care and treatment rendered in such cases by physicians, physician-assistants, and nurse practitioners, in Fremont County, Colorado or in any similar medical community.

36. At all times material to this action, Defendant, by and through its staff, physicians, employees, and/or agents, acting within the course and scope of their employment and/or agency, negligently breached the duty of care owed to Plaintiff Demuzio, by failing to

care for, treat, or follow prescribed treatment in the care of Plaintiff Demuzio within accepted standards of care.

37. As a direct and proximate result of the deliberate indifference and negligent acts and/or omission of the Defendant's employees, Plaintiff Demuzio has suffered pain, mental anguish, bodily injury, and permanent scarring, and will continue to suffer pain, mental anguish, and permanent scarring.

WHEREFORE, Plaintiff, Brad L. Demuzio, demands judgment against the Defendant, United States of America, as follows:

a. The sum of 1,800.000.00;

b. The costs of bringing this suit;

c. Post-Judgment interest; and,

d. Such other relief that this Court deems just and proper.

Dated this 27th day of October, 2017

                Earl & Earl, PLLC


                /s/ Ryan T Earl
                Ryan T. Earl
                Attorney for Plaintiff
                Earl & Earl, PLLC
                1259 Lake Plaza Drive #230
                Colorado Springs, CO 80906
                Telephone: 719-900-2500
                Fax No.; 719-269-8832
                Email: enepllc@gmail.com

# VERIFICATION

**STATE OF IDAHO )**
**)ss**
**COUNTY OF BANNOCK )**

BRAD L. DEMUZIO, being first duly sworn upon oath, says:

That he has read the above foregoing Complaint; that he knows the contents thereof and believes that the facts stated herein are true.

BRAD L. DEMUZIO

SUBSCRIBED AND SWORN to before me this 25 day of October, 2017.

BRENT GALLUP NOTARY PUBLIC STATE OF IDAHO

NOTARY PUBLIC FOR IDAHO
Residing at:
Commission Expires: Comm. #2017-0312 Expires 8/18/2023 Resides in Pocatello, ID

| **CLAIM FOR DAMAGE, INJURY, OR DEATH** | **INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States Department of Justice<br>Federal Bureau of Prisons<br>Control Office<br>320 First Street NW<br>Washington DC 20534 | Brad Lee Demuzio<br>433 Roanoke<br>Chubbuck, ID<br>83202<br><br>Counsel for Mr. Demuzio<br>Attorney Don Thorpe<br>Kumpf Charsley & Hansen, LLC<br>9565 S. Kingston Court, Suite 100<br>Englewood, CO 80112 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY ☒ CIVILIAN | 02/09/1977 | Married | December 31, 2014 | Early a.m. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See Attached

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Loss of right testicle, severe pain , swelling, loss of mobility for approximately three months; disfigurement and permanent injury as more fully described in the attached "Basis of Claim."

11. **WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Cathy Olguin, R.N.<br>Frank Cordova, N.P.<br>R. Camacho, P.A. | Cordova, Frank 8383 South Wadsworth Court, Littleton, CO 80128 |

12. (See instructions on reverse). **AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| $0.00 | $1,800,000.00 | | $1,800,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | (720) 473-8009 | 10/31/2016 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

EXHIBIT 1

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☐ No

NOT APPLICABLE

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☐ No

NOT APPLICABLE

17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

NOT APPLICABLE

19. Do you carry public liability and property damage insurance? ☐ Yes If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☐ No

NOT APPLICABLE

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

***(d)*** **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

## 8. BASIS OF CLAIM

A. ***Background and Claim Summary.***

The events underlying the claim occurred at the US Bureau of Prisons-Florence Prison Camp in Florence, Colorado beginning on December 31, 2014. Brad Demuzio, 38, was incarcerated at the Florence Prison Camp following a guilty plea to one count of wire fraud committed in Idaho in his capacity as President of Demuzio Capital Management in 2011. He was imprisoned from approximately mid December 2012 thru April 2016, (the last six months of which were spent in a half-way house and under house arrest in Idaho). While in Florence he worked as an orderly in the Health Services Unit (HSU) for 29 months. He has since returned to Pocatello, Idaho, where he lives with his wife and young family and works as general manager for Market Direct Fleet, an automobile fleet management company.

Mr. Demuzio's injuries and damages were caused by the BOP's deliberate indifference in failing to provide medical care for a serious medical emergency which occurred on December 31, 2014, and continued through February 2015. The actions of the BOP in not staffing the HSU at the prison camp from the afternoon of Wednesday, December 31, 2014 through the morning of Friday, January 2, 2015, coupled with the failure of its physicians, Dr. George Santini and Dr. Anthony Oba, to diagnose and treat Mr. Demuzio's torsioned testicle until after January 6, 2015, when he was finally taken to the Emergency Department at St. Thomas More Hospital in nearby Canon City, constituted deliberate indifference to Mr. Demuzio's serious medical need and resulted in the unnecessary loss of Mr. Demuzio's right testicle.

His damages also include the extreme physical and mental pain and suffering which continued for 34 days until the surgery was finally authorized to remove the swollen and necrotic testicle on February 3, 2015. Mr. Demuzio has also suffered permanent injury in that his testosterone level is significantly less affecting his sexual performance and his and his wife's intimacy issues. He is disfigured with two large scars and only one testicle. He also believes that his lowered testosterone affects his mental acuity, energy and work performance.

***B. Factual basis of the Claim:***

At approximately 3:00 a.m. on December 31, 2014, Mr. Demuzio awoke with extreme pain in his low back, groin and especially right testicle. At 6:00 am he reported to the HSU sick call and was seen at 8:48 am by Dr. Santini who misdiagnosed the condition as an infection and prescribed an antibiotic, Bactrim, for five days. However, Dr. Santini, per the medical chart, ordered an x-ray to be done that day but no diagnostic or radiology testing was done until January 6, 2015, at the St Thomas More Hospital ER. A good question is why the doctor ordered an x-ray at all as the proper test would have been an ultrasound to verify blood flow to the testicle. If the ultrasound had been done on December 31 or January 1, 2015, the torsioned testicle would have been diagnosed and proper emergency treatment could have been obtained to save the organ. The Florence Prison Camp HSU was closed on January 1, 2015, New Year's Day, but it is unknown why radiology or other diagnostic tests were not done between December 31, 2014, and January 6, 2015 as both the technology and personnel were or should have been available at the larger prison complex HSU. In any case, they were available just down the road at the hospital ER in Canon City.

The St. Thomas More Hospital Emergency Department in Canon City, Colorado is 9.4 miles from the town of Fremont where the prison is located. Considering the risk and immediate need for treatment for "testicular torsion", if an ultrasound could not be done at the prison, a quick transport to the ER was not only possible but was the only reasonable treatment option given Mr. Demuzio's presenting symptoms.

By 8:00 p.m. on December 31, 2014, Mr. Demuzio's right testicle was swollen to the size of a grapefruit, the pain was unbearable and he could not walk, sleep or get out of bed without assistance.

On Friday, January 2, he reported again at the HSU at 6:00 a.m. and his symptoms were unchanged. Nurse Kathy Olguin, a U.S. Public Health Nurse assigned to the prison, examined him at 8:40 a.m. and immediately diagnosed the problem as "testicular torsion". She advised that he should be immediately transported to the emergency room at St. Thomas More Hospital in Canon City for surgery to save the testicle. The nurse called Dr. Anthony Oba, the BOP staff physician at the prison complex, to authorize the transport. Dr. Oba, without seeing Mr. Demuzio, intentionally discounted and ignored nurse Olguin's clinical findings, observations and diagnosis. Dr. Oba then prescribed another antibiotic and specifically denied the request for transport to the ER. Because of the extreme pain, Olguin apologized to the patient and administered Toradal by injection before returning him to his "assigned cubicle." Neither the diagnosis nor the fact that an injection was given is noted in Mr. Demuzio's medical chart but the following findings are in the chart: "Inmate describes current medical situation as … 'I have had extreme pain in the left testicular [sic] for 48 hours, swollen, hard to palpation, unable to displace any of the tissue back into the body. Extremely pain full to stand up was unable to put on my pants. I iced it last night to see if it would help with the swelling and nothing helped. The pain never goes away it gets worse at times.'" The pain was noted as an 8 on a 1-10 scale. Nurse Olguin also noted: "Testicular tenderness R, Epididymal Tenderness R, Swelling R, Hardness R, Asymmetry R."

The medical literature is consistent in reporting that with prompt diagnosis and treatment a torsioned testicle can be saved, but irreversible ischemia begins around six hours after onset and emergency diagnosis and care is required to minimize the risk of testicle loss. The problem usually presents with sudden severe testicular pain in the groin and lower abdomen. Swelling and nausea are also typically present—exactly the complex of symptoms presented by Mr. Demuzio on both December 31 and January 2, 2015. [See: Sharp,VJ: Kieran, K; Arlen, AM (Dec 15, 2013). "Testicular torsion; diagnosis, evaluation, and management." *American Family Physician* **88** (12); 835-40. PMID 24364548.] The diagnosis is obvious enough that ultrasound tests need only be obtained in low suspicion cases to rule out torsion but an ultrasound is 90% accurate in identifying the absence of blood flow in the twisted testicle which distinguishes it from an infection. There is also a 90% chance of saving the organ if it is treated either manually or surgically within 6 hours of onset. At 12 hours the rate decreases to 50% and continues to decrease until at 48 hours there is little chance of success. [See: Wampler SMK, Llanes M (September 2010). "Common scrotal and testicular problems". *Prim. Care* **37** (3); 613-26, x. doi;10.1016/j.pop.2010.04.009 PMID 20705202.

Six hours after the injection of Toradal by Nurse Olguin on January 2, the pain returned and did not abate for the next four days as no further treatment was available due to the HSU being closed and unstaffed over the weekend and also on Monday January 5. It was not until Tuesday, January 6, 2015, that medical care was available to Mr. Demuzio at the Prison Camp Health Services Unit.

On January 6, 2015, Mr. Demuzio was seen by USPHS nurse practitioner Frank Cordova, who, (as did Nurse Olguin five days earlier), correctly identified the problem. Mr. Cordova arranged for transport to the Emergency Department at St. Thomas More Hospital where a CT scan and pelvic ultrasound were done. The radiologist advised that there was no blood flow to the testicle, it was too late to be saved and surgical removal was necessary. Urologist, Dr. Christopher Harrigan M.D., who later performed the surgery, examined him and confirmed the radiologist's findings. Prescriptions for pain and possible infection were given and Mr. Demuzio was returned to the prison farm where, over the next week, Dr. Santini and physician's assistant Camacho also accepted the diagnosis. The case then became a long painful waiting game to determine when the BOP bureaucracy might approve and arrange for the medically advised surgery.

The BOP medical chart notes made by NP Frank Cordova on January 6, 2015, include: "Inmate was seen for testicular pain he reports as a 10 and he was nauseated with feeling of doom from all the lower scrotum pain...felt the pain was just terrible over the last several days he was diagnosed with an infection and given an ABT but he reports it did not worked [sic]." NP Cordova also wrote: "Inmate has testicle pain that feels he is about to blackout."

The St. Thomas More Hospital radiology report findings of the scrotum ultrasound done on January 6, 2015, states: Right Testis is diffusely hypoechoic with no significant vascular flow. Under "Impressions" the report states: "Consistent with right testicular torsion." A copy is attached as Exhibit "A". Also attached as Exhibit "B" is Mr. Demuzio's medical chart as received from the Bureau of Prisons (FOIA request) for the period beginning December 31, 2014 through March 12, 2015.

Over the course of the next three weeks, Mr. Demuzio was seen again at the hospital where, on January 13, 2015, one more ultrasound was done. He was also seen by Dr. Harrigan in his office on January 15, for a pre surgical consult after which the doctor stated that the surgery should be done as soon as possible.

Notwithstanding Dr. Harrigan's opinion, Mr. Demuzio was returned to the FPC where he received no further treatment or prescription medication or pain relievers from the doctors and staff at HSU for the constant pain and extreme discomfort he was experiencing. From January 16 to February 2, 2015 daily inquiries were made as to the status of the BOP approval for the surgery ordered by Dr. Harrigan. At no time after January 6, 2015, did any BOP doctor or nurse tell Mr. Demuzio that they disagreed with Dr. Harrigan's medical opinion or need for surgery.

Finally on February 3, 2015, thirty five days after the initial onset of symptoms, Mr. Demuzio was sent to the Arkansas Valley Surgery Center where Dr. Harrigan surgically removed his right testicle. Mr. Demuzio arrived at the center at 12:05 p.m.; surgery began at 1:16 p.m. and ended at 2:15 p.m. Mr. Demuzio was discharged at 3:18 p.m.

He was returned to the FPC at approximately 3:45 p.m. and, not surprisingly, had significant post-surgical pain requiring Percocet for several days and was unable to walk or work for a week. The medical records confirm that as the pain subsided, in mid-February to early March, he became increasingly depressed, irritable, and unable to concentrate and experienced severe mood changes. He was seen on March 3, 2015, and diagnosed with "Adjustment Disorder with Depressed Mood" for which he was given a 30-day prescription of Fluoxetine (Prozac) but this was stopped by Dr. Santini a week later with the suggestion that he follow-up with mental health counseling instead, if needed.

***C. Legal Basis for the Claim:***

It is well established that correctional facilities have an obligation to provide medical care to prisoners as they are unable to seek medical treatment elsewhere. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). "Elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or a lingering death', the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency..." *Estelle v. Gambrelle*, 429 U.S. 97 (1976).

In *Martinez v. Garden*, No. 05-4019, 2005 U.S. App. Lexis 27179 (10th Cir.) the Tenth Circuit found that a Utah prisoner's allegations were sufficient to support his claim of deliberate indifference to a serious medical problem wherein prison officials failed to provide surgery for problems with his testicles after his symptoms did not "resolve themselves" within a month after becoming symptomatic and being diagnosed.

Further, in *Boyd v. Robeson County*, No. COA03-1222, 621 S.E.2nd 1 (N.C. App. 2005), the court found that the plaintiff inmate adequately stated a claim under the Eighth Amendment where his complaints of pain, nausea and vomiting were not properly addressed for two days leading to a ruptured appendix. From the facts alleged, it was obvious that medical care was required and the official's failure to promptly arrange for it, especially where it resulted in further injury, was a proper basis for civil liability.

Also of interest is *Oxendine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001) in which the inmate's claim, also against the Federal Correctional Institute in Florence, Colorado was allowed to proceed where a similar delay in proper treatment caused the loss of the prisoner's finger.

Finally, in *Hoptowit v. Ray*, 682 F.2d 1237, 1252-53 (9th Cir. 1982), the court emphasized the need for an adequate system for responding to emergencies holding that if outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide the facilities and staff to handle those emergencies within the prison. Here, the Canon City hospital ED was not "too remote or inaccessible" but the BOP provided neither the required,

on site, emergency medical services nor even the most minimal staffing to take advantage of the proximity of available emergency care nine miles away in Canon City.

In not providing for competent emergency care at the Florence Prison Camp between December 31, 2014 and January 6, 2015, and appropriate care--including pain control and removal of the dead testicle—for over three weeks thereafter, the BOP violated its own standards for inmate patient care. These standards are found in the U.S. Department of Justice, Federal Bureau of Prisons, Program Statement, under: *Patient Care; OPI: HSD/HPD;* Number 6031.04; *effective* Date: June 3, 2014. It is a lengthy document but for easy reference we have attached several of the more relevant pages as Exhibit "C".

The standards require 24 hour medical care, either at the prison or through external emergency facilities including "Emergency on-call procedures for hours that health care providers are not on site."

Also found under "9. Emergency/Urgent Care", is: "ACA standards require a four-minute response to life-or limb- threatening medical emergencies." The term "limb" is not defined but it could be well argued that a testicle is an appendage not completely unlike other limb/appendages such as feet, toes, hands, fingers, arms or legs and the loss of a young man's testicles is, in many ways, as significant or more significant to his health and well-being as the loss of a finger or toe. *Response time in this case obviously never approached four minutes.*

Without belaboring the point, reviewing the attached Exhibit "C" reveals violations of many of the BOP's own standards by the FPC unit of the Federal Prison Complex in Florence, Colorado in the time frames in question. Those violations each caused or contributed to Mr. Demuzio's injuries and damages. In addition, such violations of the BOP's own internal requirements are strong evidence of not just negligence but rise to the legal standard of "deliberate indifference" which is met when a known risk of harm is enhanced by failure to provide appropriate medical treatment or delaying such treatment.

Nurse Olguin knew it was a torsioned testicle on the morning of January 2, 2015 when she evaluated the very same clinical symptoms that Dr. Santini saw on December 31, 2014. Had she or any other competent health care provider been at the HSU between the morning of 12/31/14 and 1/2/15, the testicle would likely have been saved. And if *anyone* had been staffing the HSU between the 2nd and the 6th, an enormous amount of pain and suffering would have been avoided. Similarly, had the medical staff not delayed a surgery that was known to be needed after the January 6, 2015 hospital ultrasound was done, a great deal more suffering could also have been prevented.

Three likely favorable witnesses were identified by Mr. Demuzio to counsel but attempts to contact and discuss the claim with them were blocked by US Justice Department attorney, Clay C. Cook. It was one of them who recommended to Mr. Demuzio, before his release, that an FTCA claim be filed.

Please Note:  Exhibits D & E include Mr. Demuzio's hospital and surgical records.



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

*Office of the Regional Counsel*

400 State Avenue
Tower II, Suite 800
*Kansas City, KS 66101*

MAY 02 2017

Attorney Don Thorpe
Kumpf Charsley & Hansen, LLC
9565 S. Kingston Court, Suite 100
Englewood, CO 80112

Re: Administrative Claim Number TRT-NCR-2017-01395
Brad Lee Demuzio, Personal Injury: $1,800,000.00

**CERTIFIED NUMBER 7016 0910 0000 2694 5208**

Dear Mr. Thorpe:

The above referenced tort claim has been considered for administrative review pursuant to 28 C.F.R. § 0.172, Authority: Federal Tort Claims and 28 C.F.R. Part 14, Administrative Claims Under Federal Tort Claims Act (FTCA). We have completed our investigation of your client's claim alleging personal injury. Investigation of this claim did not reveal your client suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment.

As a result of this investigation, your claim is denied. This memorandum serves as a notification of final denial under 28 C.F.R. § 14.9, Final Denial of Claim. If you are dissatisfied with our agency's action, you may file suit in an appropriate U.S. District Court no later than six months after the date of mailing of this notification.

Sincerely,

Richard M. Winter
Regional Counsel

**EXHIBIT 2**

**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS 66101*

12-16-2016

BRAD DEMUZIO, #14628-023
433 ROANOKE
CHUBBUCK, ID 83202

Re: Administrative Claim for Damages
Claim #: TRT-NCR-2017-01395 $ 1,800,000.00

Dear Claimant:

This is to notify you of our receipt of your administrative claim for damages under provisions of the Federal Tort Claims Act, Title 28 USC §1346(b), 2671 et. seq., alleging liability of the United States Government.

Your claim was received on 11-14-2016. The above referenced Act provides that the agency has 6 months to make an administrative determination on your claim from the date such claim was received by the appropriate agency. Accordingly, in the matter of the above referenced claim, the government's response is not due until 05-13-2017.

Regulations that may be pertinent to your claim may be found at Title 28 C.F.R. Part 14 et:seq., and §543.30.

Sincerely,
Richard M. Winter
Regional Counsel

**EXHIBIT 3**